AO-106 (Rev. 06/09)-Application for Search Warrant

# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

*FILED*

*JUL 18 2025*

*Heidi D. Campbell, Clerk*
*U.S. DISTRICT COURT*

| | |
|---|---|
| In the Matter of the Search of<br>*Location Information Concerning Cellular Telephone*<br>*Assigned Call Number (813) 857-4703, with Service*<br>*Provider T-Mobile* | )<br>)<br>)<br>)<br>) |

Case No. 25-mj-607-CDL

**FILED UNDER SEAL**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A": This Court has authority to issue this warrant under 18 U.S.C. § 2711(3)(A),
And Federal Rule of Criminal Procedure 41.

located in the <u>Northern</u> District of <u>Oklahoma</u>, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☐ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| **18 U.S.C. §§ 1512(b)(1), and (k)** | **Conspiracy to Tamper with Witnesses, Victims, and Informants** |

The application is based on these facts:
**See Affidavit of Sterling Juarez, attached hereto.** To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the warrant will also function as a pen register order. I thus certify that the information likely to be obtained is relevant to an ongoing criminal investigation conducted by the ATF. *See* 18 U.S.C. §§ 3122(b), 3123(b)

☐ Continued on the attached sheet.

☑ Delayed notice of <u>30</u> days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Mike Flesher*
*Applicant's signature*

Mike Flesher, Assistant United States Attorney
*Printed name and title*

Subscribed and sworn to by phone.

Date: July 18, 2025

*Judge's signature*

City and state:  Tulsa, Oklahoma

Christine D. Little, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In the Matter of the Search of Location Information Concerning Cellular Telephone Assigned Call Number (813) 857-4703, with Service Provider T-Mobile | Case No. _____<br><br>**FILED UNDER SEAL** |

### Affidavit in Support of an Application for a Search Warrant

I, Sterling Juarez, being first duly sworn under oath, depose and state:

### Introduction and Agent Background

1. I make this affidavit in support of an application for a search warrant and order under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for location information concerning the cellular telephone assigned call number (813) 857-4703, identified as being utilized by Jessica Marie Johnson (the "Target Cell Phone"), whose service provider is T-Mobile, a wireless telephone service provider headquartered at a wireless telephone service provider headquartered at PO Box 37380 Albuquerque, NM 87176-7380. The Target Cell Phone is described in the following paragraphs and in Attachment A, and the location information to be seized is described in the following paragraphs and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the

Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within the category of officers authorized by the Attorney General to request such a warrant. I have been employed as a Special Agent with the ATF since July 2017. As a Special Agent with the ATF my duties include, but are not limited to, the investigation and enforcement of violations of federal alcohol, tobacco, firearms, arson, and explosives laws.

4. I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center as well as the ATF Special Agent Basic Training Academy. During these courses of study, I received training in the investigation of federal firearm and explosive violations. I have been a soldier in the National Guard since September 2006, as a Combat Engineer working with U.S., foreign, and improvised explosives. I have a Bachelor of Science degree in Political Science. As an ATF Special Agent, I assist in conducting investigations into the unlawful possession of firearms. Through training, investigations, and experience, I have taken part in cases relating to the trafficking of firearms, the use and possession of firearms by persons prohibited by law, and the possession of illegal firearms. I am familiar with and have participated in various methods of investigations, including, but not limited to: electronic surveillance, physical surveillance, interviewing and

2

general questioning of witnesses, use of confidential informants, use of cooperating witnesses, use of toll records, and subscribers information. I have also debriefed confidential informants and cooperating witnesses regarding the habits and practices of people engaged in the illegal trafficking of firearms. Furthermore, I have conducted and participated in numerous investigations to include: crime scene investigations, collection of evidence, interviews, and the execution of search warrants.

5. I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, conversations with others who have personal knowledge of the events and circumstances described herein, and a review of open-source information including information available on the Internet. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact I or others have learned during the course of this investigation.

6. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, conversations with others who have personal knowledge of the events and circumstances described herein, and a review of open-source information including information available on the Internet. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the

3

application for a search warrant, it does not set forth each and every fact I or others have learned during the course of this investigation.

7. Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code Sections 1512 (b)(2), (k) – Conspiracy to Tamper with Witnesses, Victims, or Informants has been committed by Jessica Marie Johnson and other known and unknown conspirators. There is also probable cause to believe that the location information described in Attachment B will lead to the location of Jessica Marie Johnson who engaged in this crime and reveal the locations of devices used for the commission of these offenses.

### Jurisdiction

8. This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

9. The All Writs Act also provides the authority necessary for the Court to issue a ping warrant in connection with a § 2703 warrant for prospective location information. *See* 28 U.S.C. § 1651; *Matter of Search of a Cellular Telephone*, 430 F.Supp.3d 1264, 1272 (D. Utah, Dec. 26, 2019). Rule 41 limitations keep applications consistent with "the usages and principles of law." *Id.*

10. When the government obtains records pursuant to § 2703, or pursuant to a search warrant, the government is not required to notify the subscriber of the

4

existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2), and (3). Additionally, the government may obtain an order precluding T-Mobile from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize the investigation. 18 U.S.C. § 2705(b).

### Cell Phone Location Data Background

11. Agents searched the Law Enforcement Carrier Lookup database available through Lexis-Nexus on July 18, 2025. The database revealed that telephone number (813) 857-4703 is associated with the provider T-Mobile, and whose records are maintained by T-Mobile.

12. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. Providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone

and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

13. Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available.

14. Based on my training and experience, I know that T-Mobile can collect cell-site data about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

6

## Probable Cause

15. ATF agents are conducting a criminal investigation of possible violations of Title 18 United States Code, Sections 1512(b)(1), and (k) - (Conspiracy to Tamper with Witnesses, Victims, and Informants), (the "Target Offenses"), involving Christopher Ray Barrett, a/k/a "SloMo", Katelin Mary LeBlanc, a/k/a "Savvi", and Jessica Marie Johnson, a/k/a "Jessica Marie Barrett", and including locations of devices used for the commission of these offenses.

16. Jessica Marie Johnson is currently transient. Based on statements she provided Barrett in jail calls, Agents believe that she and her device(s) are within Tulsa County, Northern District of Oklahoma, however, her exact location is unknown. Agents are requesting this warrant to identify potential co-conspirators and locate the persons and devices used by Jessica Johnson to further the conspiracy.

17. According to TPD incident report 2024-068254, on December 31, 2024, the Victim reported that someone carjacked his Black Volkswagen Passat at gunpoint. The Victim provided the Passat's VIN: (1VWAP7A39CC004758) and OK tag (QIN-421) to officers. He also told officers the following:

18. On December 29, 2024, the Victim agreed to give a woman he knew as Lauren (L.) a ride from River Spirit Casino to a home at 2937 E 78th ST in Tulsa, Oklahoma, Northern District of Oklahoma. While at the Casino, L. told the Victim about the home's owner, Chad, who was currently incarcerated at David L. Moss. L. said that she also lived at that address and showed the Victim her ID, which listed her address as 2937 E. 78th Street. L. asked the Victim to help her retrieve some of

7

her belongings from the house and the Victim agreed. Early that morning, the two left the casino and drove to the home. At the home, L. loaded some of her belongings from the house into the Victim's Passat. These belongings consisted of bags of women's clothes and various other items from the home. The two drove around the Tulsa area for a few hours searching for a place to store L.'s property.

19. Later that morning, L. noticed that she left her wallet and ID at Chad's house. The Victim drove L. back to 2937 E. 78th Street to retrieve her wallet.

20. Per interviews conducted by an ATF agent, when L. and the Victim arrived at the home, a woman named Niki Cole-Shatwell was at the house, as well as Christopher R. Barrett, who goes by the name 'Slomo', as well as Barrett's girlfriend Katelin Mary LeBlanc, who goes by 'Savvi', and a woman named A. P. were at the house when L. and the Victim arrived.

21. When L. and the Victim returned to Chad's house, they found a heavily tattooed man and a red-haired woman working on a maroon truck in the driveway. The Victim asked L. who the man and woman were, and L. replied 'SloMo' and his woman. L. got out of the car and Barrett jumped into the front seat of the Victim's Passat. Once inside the Passat, Barrett pulled out a silver firearm which he pressed to the Victim's head.

22. With the firearm to the Victim's head, Barrett told the Victim that "he has one chance to tell him whose stuff is in [the Passat]." The Victim said it was L.'s property. While continuing to point the firearm at the Victim, Barrett directed him to back his Passat into the home's driveway. Once backed in, LeBlanc blocked the

8

Passat in the driveway with the maroon truck. Barrett ordered the Victim to unload everything from the Passat, including the Victim's property, and put it in the house. Barrett told the victim that the property was going to stay at the home until Chad got out of jail.

23. The Victim and some of the women at the home removed all the property from the Passat and placed it in the home. Barrett then ordered the Victim inside the home. Once inside, Barrett removed his shirt and told the Victim that he's "lucky he's not dead." Barrett took the Victim's phone after he noticed the Victim using it. Additionally, LeBlanc attempted to take A.P.'s phone, to prevent her from contacting police. Barrett informed the Victim that his Passat would remain at the house. Further, Barrett told the Victim that he would need to talk with Chad, as a man, to get the Passat and his property back. Barrett told the Victim to get Niki Cole-Shatwell's phone number and to call in a few hours. Barrett and LeBlanc then drove the Victim to the Victim's house in Barrett's maroon truck, leaving the Victim's Passat at Chad's home.

24. According to the police report, once they arrived at the Victim's home, Barrett told the Victim to bring him the Passat's title or "there would be problems." The Victim went into the home, retrieved the title, and gave it to Barrett. Barrett then droves away from the Victim's home. On December 31, the Victim reported the Passat as stolen and gave a description of Barrett to the police.

25. On January 1, 2025, TPD officers found the stolen Passat at a QuikTrip located at 3230 E Admiral PL in Tulsa, Oklahoma, Northern District of Oklahoma.

9

The Passat had a different license plate number; however, they noticed the Oklahoma DMV recently issued a new tag. They ran the previous tag number and found the Victim's stolen vehicle report. Officers confirmed the Passat was the same one from the robbery by the Passat's VIN number.

26. There were two people and a dog in the Passat. When the passenger entered the QuikTrip, TPD officers moved to detain both people. TPD identified the driver as Christopher R. Barrett and the female passenger as G.F.

27. From outside the vehicle, officers spotted the handle of a firearm in plain view wedged between the center console and front passenger seat which they took into evidence. The firearm was a silver Smith & Wesson revolver, model 642 Airweight, caliber .38 SPL, with serial number: CYJ1019. The revolver was loaded with five rounds of ammunition.

28. Officers learned that Barrett is a convicted felon with multiple violent felony convictions including Second Degree Murder and Assault with a Dangerous Weapon. Further, Barrett matched the physical description of "SloMo" the Victim gave police when he reported carjacking.

29. The officers read Barrett his Miranda rights, which he verbally waived, and agreed to speak with detectives. Officers transported Barrett and G.F. to TPD Detective Division for an interview.

30. During his interview, Barrett identified himself as 'SloMo' and said that the Passat belonged to his girl, 'Savvi'. Barrett said that the Passat is a 5-speed manual, which she does not know how to drive. When asked why his girl would own a car

she could not drive, Barrett could not answer. Ultimately, Barrett admitted that L.

took some property from his home at 2937 E. 78th Street. He admitted that he

confronted the Victim in his Passat, telling the Victim to back into the driveway,

giving the Victim a ride home, and getting the title from the Victim. He told

detectives that he was just doing what he was told and that he was told to not let the

Victim to leave the house. He would not say who was telling him to do this. He said

that one of the women told him "Slow your roll, SloMo."

31. In her interview, G.F. denied knowing anything about the firearm and said it

did not belong to her. After their interviews, detectives arrested Barrett, and released

G.F.

32. Following an examination of the firearm and ammunition seized by the TPD

officers, your affiant prepared a report of interstate nexus documenting that they

were not manufactured in the State of Oklahoma and must therefore have traveled in

or affected interstate or foreign commerce.

33. Pursuant to a Federal subpoena, Volkswagen confirmed that this vehicle was

not manufactured in Oklahoma, and accordingly must have traveled in interstate or

foreign commerce in order to arrive in Oklahoma.

34. On February 3, 2025, a Federal grand jury indicted Christopher Ray Barrett

in Northern District of Oklahoma case number 25-CR-24-SEH, for violations of 18

U.S.C. § 2119 – Carjacking; 18 U.S.C. § 924(c)(1)(A)(ii) – Using, Carrying, and

Brandishing a Firearm in Furtherance of a Crime of Violence; and 18 U.S.C.

§ 922(g)(1) – Felon in Possession of a Firearm.

11

35. In April 2025, the ATF became aware of calls made by Barrett in March of 2025 which possibly constituted attempts to tamper with witnesses in his case. The ATF investigation and review of Barrett's communications from the jail revealed the following:

36. Barrett had been in contact with several people while in custody awaiting trial, including his wife, Jessica Marie Johnson, and his girlfriend, Katelin "Savvi" LeBlanc. A records check revealed that Jessica Johnson is a convicted felon with prior convictions for drug and firearm related offenses.

37. Undersigned affiant reviewed Barrett's calls, video calls, and messages and believes that the following communications show Barrett, Johnson, and LeBlanc, have conspired to obstruct justice and coerced witnesses to prevent their testimony (text within quotes is verbatim despite any grammatical errors):

38. <u>January 2, 2025:</u>

    a. Voice call: Barrett said that his arrest was over the stuff that had happened at [Chad's] house the other day, and Johnson asks him to give her a chance to fix it. Johnson asked the last name of the girl Barrett was arrested with or who she needs to contact to find out and then said that she will find out.

    b. Voice call: Johnson told Barrett he needed to trust her and give her a chance to "fix it". Barrett told her the alleged victim is a white boy.

    c. Voice call: Johnson said she was working on a "secondary solution." Barrett asked Johnson the name of the guy who filed charges against

him and Johnson responded that she is finding out. Barrett said that he knows where the guy lives. Johnson started to reply, then said that she loves Barrett and she "...can't say that." Johnson said she's waiting on a phone call; she doesn't see any other way to do it as fast as "this option" would be, and she did not ever want to do "this" again, but she will do it. Johnson said she would like to talk but cannot talk on this line. She reiterated that she would like to be able to just talk to Barrett but cannot on this line, and they cannot talk about it on the jail phone. Johnson said she will figure things out because she needs an answer to something that Barrett knows but cannot ask him on this line.

d. Voice call: following a discussion of Barrett's bond, Johnson said that R. (last name unknown) would send her the name of the passenger in the Passat at QuikTrip. Barrett denied that there had been a girl in the car with him when TPD arrested him and said that the girl had simply been at the QuikTrip asking him for a ride. Johnson said that the "other information" that she needs can be taken care of another time. (This appears to be a reference to attempts to identify and tamper with witnesses in Barrett's case.) Barrett said he doesn't care about anything except "getting after some motherfuckers". Barrett asked about the information R. is going to give Johnson. Johnson said she had told R. "this is the information I need". Barrett asked what information that is. Johnson says that TPD isn't giving her the information she needs.

Barrett told her to ask him, and he will tell her because there is nothing

the TPD would tell her that Barrett cannot tell her. Johnson replied

"James-" and interrupted herself to say she cannot ask Barrett on this

phone because "they listen like a motherfucker." Barrett told her to tell

him. Johnson said she wants to know who is alleging that Barrett did

these things. Barrett told Johnson she needs to send somebody out to

talk to Chad at his home.

39. January 5, 2025:

    a. Video call: Barrett asked Katelin LeBlanc What's up with that dude that

       filed these charges on me?" LeBlanc says "Ok, so, I'm working on all

       that." Barrett asks "Is he trying to retract his statement?" LeBLANC

       says  "Uh, he's going to. LeBlanc says she has been talking to Niki, and

       Niki has been talking to [the Victim's] friend, and she is taking care of

       it. Barrett tells LeBlanc to get video from Chad and his neighbors, but

       LeBlanc says Chad is being difficult. Barrett says "That dude told the

       police that I fucking robbed him at gunpoint and shit" to which

       LeBlanc responds "I know. I know. I'm gonna take care of it."

40. January 7, 2025:

    a. Text message: Niki Cole-Shatwell texted B. M., a friend of the Victim,

       to ask him "Hey, do u thank [the Victim] or whatever his name is do u

       think he'll drop charges on my homeboy" and, "Well he's really not

       my.honeboy but still".

b.  Video call: LeBlanc tells Barrett she has a couple of things in the works, but she cannot talk about it. Barrett asks, "What's up with that dude?" LeBlanc replies emphatically "I can't talk to you about it, I got some shit in the works." Barrett says "Hey, look, all he got to do is go retract his statement, man." LeBlanc responds even more emphatically "I KNOW. I'm on top of it, like... he... you have no idea. You have no idea." Barrett asks, "Is he gonna show up to court?" LeBlanc smiles and shakes her head. Barrett says, "You say no?" LeBlanc says, "He shouldn't. Don't think so." LeBlanc makes more comments to the same effect throughout the rest of the call, that she cannot talk about what she is doing on this line and that she is working toward making this all go away.

c.  Text message: Barrett texts LeBlanc, "i was on the way back to youwhenthey got me and as long as he dont show up to court ill be back to you asap" LeBlanc responds, "Is Jessica not getting you out ?"

41. January 9, 2025

a.  Video call: Barrett asks LeBlanc, "What's the dude talking about?" LeBlanc responds, "He ain't talking about nothing, he don't want nothing to do with it, he's not gonna be coming—or, showing up for none of it, or nothing, so... I took care of it." Barrett says, "If you can, get ahold of that dude and tell him to go to the Public Defender's office and motherfuckin' write a statement saying that he wants to retract all

15

that shit." LeBlanc says that she already did. After more discussion, LeBlanc tells Barrett not to talk about it on this phone.

b. Video call: Barrett asks LeBlanc, "So like... it's for sure about [the Victim], right?" LeBlanc says, "Yeah, for sure. Yeah, for sure." Barrett asks, "Is he going to go write the statement?" LeBlanc responds, "Look, man, you can't keep asking me this on this goddamn phone! That'll compromise everything! Shut up about it, I got it!"

c. Text message: Barrett texts LeBlanc, "...and im coming ho e to you as long as that dude fixes what he did" LeBlanc responds, "Boo. I'm working on all that. You know I am."

42. January 10, 2025

a. Text Message: LeBlanc texts Barrett, "did more than plentifully enough for your a**You have no right to try to demand or expect or even request anything at this point." and "And it's fucked up that either I gotta risk my life even to have a chance for even another night in your arms."

43. January 11, 2025

a. Text message: Johnson texts Barrett:

Johnson: "And while I'm all the way down to do this or whatever the fuck else, you know what's coming behind this right?"

16

Barrett: "then dont do it if we cant do it and get away with it"

Johnson: "I mean I have a plan but I'm sure she won't stop digging until she figures it out but I feel like it's a necessary and calculated risk. Idk. I mean I still do have to get into it but hopefully I can bc I fucking KNOW that's 2k right there"

Barrett: "boo do you really think igot this case beat like 100 percent beat"

44. January 19, 2025

    a. Text message conversation between Jessica Marie Johnson and Barrett:

Johnson: "So you have no idea what the guys name is? I thought he signed the title? Do you have any idea where you dropped him off or his sister's name or really the names of anyone involved?"

Johnson: "Baby I need the info for anyone involved in this situation. Anything you can remember. Bc [Chad] won't respond to me"

Barrett: "niki agela savvi chads daughter her husband chad me you R."

Johnson: "I'll figure out where all those people are."

45. January 21, 2025

    a. Video call: Barrett asks LeBlanc what's up with that dude. LeBlanc says, "Oh, he's not going, he said he's not going to nothing."

46. January 24, 2025

a. Text message: Johnson tells Barrett she has gotten his TRACIS and they do not name the female. Johnson also says, "Yep. They fucked up. They left the list od witnesses blank but included a TPD # in that spot and the format of that # is a rat #. Also have the officers cell # now." (The term "rat number" may be a reference to a Confidential Informant number).

47. February 1, 2025

a. Video call: Johnson says to give her the other names Barrett needs her to get fixed because she doesn't give a fuck about any of them except the ones Barrett wants her to get fixed.

48. February 2, 2025

a. Video call: Barrett tells G. F. that, "If they find me guilty on this shit, or, like…. If people come to court on me on this shit, I'm going to prison for the rest of my life."

b. Text message: Barrett tells Johnson that he talked to G. F. and got her all confused.

49. February 5, 2025

a. Text message: LeBlanc texts Barrett, "you really fucked up today just thought you should know that nigga"

b. Text message: Johnson tells Barrett that nobody showed up to court (an apparent reference to his state case).

50. February 14, 2025

18

    a. Text message: Johnson tells Barrett that she is going to need his homeboys, the ones with no morals, to be on standby next week.

51. <u>January 21, 2025</u>

    a. Video call: Barrett asks LeBlanc what is up with "that dude". LeBlanc says, "Oh, he's not going, he said he's not going to nothing."

52. <u>January 31, 2025</u>

    a. Video call: Barrett asks Johnson, "Hey, you remember the... the passenger? Why is she trying to help me so much?" Johnson says "Oh, she's trying to help you? She's gonna take her gun charge, is that what she's gonna do? Is that what she's gonna do, she's gonna take her shit? Yeah, she is gonna take her shit, is what she's gonna do. She is, baby."

53. <u>March 3, 2025</u>

    a. Text message: Barrett says, "no you dont understand this nigga that said i robb im is working with them for real and they reallytrying to put me away for along time. do you really love me" Johnson says yes, and Barrett responds, "hello im asking you that for a reason and dont j8st say yes"

54. <u>March 8, 2025</u>

    a. Video call: Johnson said she has been in contact with [the Victim] and Chad on "her page". She said [the Victim] might invite her over.

55. <u>March 13, 2025</u>

a. Video call: BARRETT begins to cry and says "I'm sorry, Jessica Marie, that I did this. I'm sorry I didn't listen to you that day. I'm sorry I didn't just get in that truck and fucking leave." and, "Who would have thought that that dude would-- Come on, man, I gave that dude a chance! I could have called the police on that dude!" JOHNSON says, "He has decided that he, in fact, will not be in court on the 19th. He is not coming."

56. March 19, 2025

a. Video call: Barrett directed Johnson to pick up a "tool" (Common slang for a firearm) from an individual named K-Loc or T-Loc, who was the one who had given Barrett "...all those pills." Johnson said she would stab Chad in the neck if she saw him. Barrett is upset that Chad will not tell the truth about how he got a phone call from Barrett. Barrett told Johnson to go to Josh and let Barrett talk to him and he will go "get people right." Barrett gets frustrated and says that what he needs is for everyone to "get on [his] case", apparently referring to possible witness tampering. Johnson said they can't talk about it on this phone or it will get used against Barrett in his case.

57. March 29, 2025

a. Text message: Barrett texts Johnson to tell her to call Niki Cole-Shatwell and gives Niki's number as (XXX) XXX-8708

b. Text message: Niki Cole-Shatwell texts Johnson to say that Barrett instructed to get in touch with Johnson.

58. <u>March 30, 2025</u>

a. Text message: Johnson texts Niki saying they need Niki to talk to Barrett's attorney to refute what "…this guy [the Victim] is saying."

59. <u>April 2, 2025</u>

a. Text message: Barrett tells Johnson that he talked to his lawyer and it's all bad. Johnson texts back, "…I'm coming down there in the am to get those papers then post up in your attorney's office. He, the investigator, and Niki still aren't answering. I found the one they havent been able to and am thinking bout just having him chill w me so i can bring him with me tomorrow.m to talknto everyone. I'll go meet with the DA to see how stuck on those lifes they are"

60. <u>April 25, 2025</u>

a. Text message: Barrett texts Johnson, "baby bring me home and this will all be over i promise" Johnson texts back, "I'm trying. But I have to move extremely carefully"

61. <u>April 28, 2025</u>

a. Text message: Johnson texts Barrett, "U don't know wtf I got working. U don't know wtf is going on. I WILL NOT DISCUSS IT IN THIS MF LINE."

62. <u>May 8, 2025</u>

a. Video call: Barrett tells Johnson that Josh would give Johnson a gun. Johnson does not think he has one, and Barrett points out that he just shot his dog. Johnson says that's right, and he probably has guns. Barrett says to remind Josh that Barrett did not leave him in the county jail and "came for his motherfuckin' ass fresh out the penitentiary." Johnson says she will remind Josh. Barrett says, "No, I just don't like the fact that, motherfuckin', he seems to forget all the fuckin' time, nigga, how many times I been there for him." Johnson agrees to talk to Josh and see if he will move based on Barrett's urging, because he's not moving for Johnson alone.

63. <u>May 9, 2025</u>

a. Video call: Barrett asks whether Johnson is talking to 'his' Niki (this is apparently to differentiate from a 'Nikki' they had been talking about earlier in the conversation). Johnson says Niki is willing to talk to the attorneys but doesn't want any part of the Saavi/Chad drama. Johnson is unsure what that is, but she can guess. Barrett says, "You need to have motherfucking [unintelligible] his bitch ass." Johnson: "Who?" Barrett: "Josh." Johnson: "Ok, I can, I can send it-- we can go over there together! Ding dong, field trip!"

b. Video call: Johnson tells Barrett, "Now, are you listen -- are you listening to me? Look at my face. Do you s -- do you [stutters] Do you hear what I'm -- do you understand what I'm talking about right now? I

don't give a fuck if you did everything they say you did, and I don't even know yet. I don't give a fuck. Not a single one. and I told you, did I not? What would happen?" Barrett asks, "Can, can, can... Can you get Niki to talk to my lawyer?" Johnson replies, "Yes, I can. Yes, I can. I'm also having, um, I'm also sitting down with the whole table from, uh, from that, that, uh, I'm sitting down with that whole table. And, uh, we gone talk about some things. We sure the fuck are."

c. Video call: Johnson tells Barrett, "Um, but, yes, that is potentially an option, um, but it might be... uh, there... very probably could be some better options presenting themselves very soon. Like I said, I been working." Barrett says that if Niki and Savvi (LeBlanc) would just come give their statements, he (Barrett's attorney) might be able to make this whole thing go away. Johnson says she is working on it.

64. <u>May 12, 2025</u>

a. Video call: Johnson, apparently referencing a woman named "Red", says to Barrett, "She ain't it. And she fucked off my whole plan. Uh, for your case. Fucked it completely, all the way off. So I'm having to play catch-up." Johnson also says, "Um, also, you, uh, you had been saying that, uh, you had been waiting to move on, uh, what's his name, um, you said-- because I had told you not to touch him? Touch him. Kill him. I don't give a fuck. Really. You can go ahead and do that if you want. Don't have to, but I'm just saying, if that is something that you

23

were wanting to do, I don't care." Barrett says, "I figured that was why you hadn't talked to me in two days, you was talking to him." The following exchange ensued:

Barrett: "That bitch rolled around with me and she carried the fucking pistol, nigga. Because I couldn't carry a fucking pistol, nigga. You know what I'm saying? Fuck it. There it is. I fucking told you what was, nigga, alright? I just told on my goddamn self."

Johnson: "Why was you riding around in body armor with two pistols on all the time?"

Barrett:   "I didn't, nigga, she's the one that carried the fucking pistol, nigga!"

Johnson: "Why would you ever give that dumb bitch a pistol? She can't--why?"

Barrett:   "Because I couldn't carry the goddamn pistol!"

65. In April 2025, TPD arrested Johnson and located three cell phones in her possession. Additionally, on jail messages LeBlanc has used at least two different phones to communicate with Barrett. TPD seized devices using a California area codes during Johnson's arrest in April 2025.

66. The undersigned knows that members of various criminal prison and street gangs commonly target, threaten, and/or intimidate witnesses to avoid criminal charges. Jessica Johnson is a self-identified member of the Irish Mob and Barrett identifies himself with the Hoover Crips.

67. On June 17, 2025, a Federal grand jury in the Northern District of Oklahoma issued a superseding indictment charging Johnson, LeBlanc, and Barrett with violating 18 U.S.C. §§ 1512(k), 1512(b)(1) – (Conspiracy to Tamper with Witnesses, Victims, and Informants). As of June 17, 2025, both women have active arrest warrants. Based on the most recent conversations in the government's possession from late-May, Barrett, and Johnson are continuing to attempt to locate witnesses from the carjacking.

68. Additionally, a prospective period of 30 days and historical period of 7 days would assist the government in identifying and locating not only the device used to further the conspiracy, but also potential co-conspirators involved in the witness tampering. *See United States v. Barajas*, 710 F.3d 1102, 1110 (10th Cir. 2013). (Approving location warrant to identify an unknown co-conspirator); *See also United States v. Perez-Espinoza*, Case No. 2:21-CR-261-TS, 2024 WL 1938103 at *5 (D. Utah May 2, 2024) (approving a location warrant because the phone's "location will identify other involved individuals").

69. Based on the above, the undersigned believes there is probable cause that the location information listed in Attachment B would provide locations of the devices that Jessica Marie Johnson used to engage in obstructive conduct and identify potential co-conspirators. There is also probable cause to believe the location information described in Attachment B will assist law enforcement in locating Jessica Marie Johnson's person.

70. In my training and experience, many suspects tend to remain in areas familiar to them. Jessica Marie JOHNSON has traveled from California to the Northern District of Oklahoma during the time of this investigation, and in a JailATM video call with Christopher Ray BARRETT on June 11, 2025 made a statement to the effect that she has accomplished her purpose in coming to Tulsa and said that she was at a QuikTrip gas station at 51st and 129th. JOHNSON has previously mentioned being in that general area of Tulsa. In a recorded jail phone call with an inmate named T.R. at David L. Moss Tulsa County Jail on June 23, 2025, JOHNSON said she was on her way to see him and expressed plans to travel with him to California, indicating that she was still in Tulsa as of that date.

71. On July 2, 2025, T-Mobile notified the government that it objected to the previous location warrant for Johnson's (918) 304-9100 number due to mislabeled attachments. Northern District of Oklahoma U.S. Magistrate Judge Christine D. Little approved and issued corrected warrants that same day.

72. In a jail communication from early July 2025, Jessica Johnson spoke with Christopher Barrett about her fugitive status. During this conversation Johnson referred to herself as "Tulsa's most wanted" and explained she is actively taking steps to avoid apprehension. On July 14, 2025, Agents believe she abandoned or disabled her previous phone using number (918) 304-9100. That same day, she stopped using contacting her co-defendant, Christopher Barrett through jail communications. Agents are unaware whether the two have communicated since July 14, 2025.

26

73. On July 18, 2025, ATF agents learned through a LeadsOnline notification that Johnson pawned an item at a E-Z-Pawn at the intersection of 31st and Garnett in Tulsa, Oklahoma, Northern District of Oklahoma the day before. On the pawn ticket, Johnson listed (813) 857-4703 as her contact number. On July 18, Agents drove to the E-Z- Pawn at 3118 South Garnett Road, Tulsa, Oklahoma. After speaking with employees and reviewing store security footage, agents confirmed that Jessica Marie Johnson pawned the item.

### Authorization Requested

74. Based on the foregoing, I request the issuance of a search warrant and order to obtain Global Positioning System (GPS) data related to the precise latitudinal and longitudinal location coordinates of the Target Cell Phone. I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41. The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in Attachment B for each communication to or from the Target Cell Phone, without geographic limit, for a period of thirty days (30) days, pursuant to 18 U.S.C. § 3123(c)(1).

75. I am also requesting historical records; specifically specialized location records and cell cite location information associated with the Target Cell Phone for sixty (60) days prior to the date of this warrant. This historical information is requested so investigators can potentially identify unknown co-conspirators, identify

locations involved in any potential witness tampering, and establish a pattern of life to effectuate the safe arrest of Johnson. The information being requested is in Attachment A for information in Attachment B.

76. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2).

77. I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile. I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably

available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

78. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

### Conclusion

79. Based on the information above, I submit that there is probable cause to believe that Jessica Marie Johnson and other known and unknown conspirators have been, and are currently engaging in, violations of Title 18, United States Code, Sections 1512(b)(1), and (k) - (Conspiracy to Tamper with Witnesses, Victims, and Informants). Also based on the foregoing, there is probable cause to believe that T-Mobile telephone number (813) 857-4703, is being used by the referenced individuals to facilitate the offense.

Respectfully submitted,

*/s/ Sterling Juarez*
Sterling Juarez
Special Agent
ATF

Subscribed and sworn to by phone on July 18, 2025.

CHRISTINE D. LITTLE
UNITED STATES MAGISTRATE JUDGE

29

## ATTACHMENT A

### Property to be Searched

1. Records and information related to a cellular telephone assigned call number (813) 857-4703, identified as being utilized by Jessica Marie Johnson (the "Target Cell Phone"), whose wireless service provider is T-Mobile, a wireless telephone service provider headquartered at PO Box 37380 Albuquerque, NM 87176-7380.

2. Records and information associated with the Target Cell Phone that is within the possession, custody, or control of T-Mobile, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

I.     **Information to be disclosed by T-Mobile**

All information about the location of the Target Cell Phone described in
Attachment A for a period of **30 days** from the date the ping begins, which is not to
exceed 14 days from this warrant, during all times of day and night. "Information
about the location of the Target Cell Phone" includes all available E-911 Phase II
data, GPS data, latitude-longitude data, range to tower data, distance to tower
information, per call measurement data and other precise location information, as
well as all data about which "cell towers" (i.e., antenna towers covering specific
geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from
the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph
(hereinafter, "Location Information") is within the possession, custody, or control of
T-Mobile, including any information that has been deleted but is still available to T-
Mobile or that has been preserved pursuant to a request made under 18 U.S.C. §
2703(f), T-Mobile is required to disclose the Location Information to the
government. In addition, T-Mobile must furnish to the government all information,
facilities, and technical assistance necessary to accomplish the collection of the
Location Information unobtrusively and with a minimum of interference with T-
Mobile's services, including by initiating a signal to determine the location of the

Target Cell Phone on T-Mobile's network or with such other reference points as may

be reasonably available, and at such intervals and times directed by the government.

The government shall compensate T-Mobile for reasonable expenses incurred in

furnishing such facilities or assistance.

This warrant will also function as a pen register order under 18 U.S.C. § 3123,

authorizing the installation and use of a pen register and/or trap and trace device to

record, decode, and/or capture the information outlined below for each

communication to or from the Target Cell Phone, without geographic limit, for a

period of thirty days (30) days, pursuant to 18 U.S.C. § 3123(c)(1).

This warrant does not authorize the seizure of any tangible property. In

approving this warrant, the Court finds reasonable necessity for the seizure of the

Location Information. *See* 18 U.S.C. § 3103a(b)(2).

T-Mobile is further required to disclose to the government the following

information associated with each communication to and from the Target Cell Phone

for a period of **30 days** from the date of this warrant, limited to information

pertaining to the following matters:

1.    Any unique identifiers associated with the cellular device, including
      ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

2.    Source and destination telephone numbers;

3.    Date, time, and duration of each communication; and

2

4. All data about the cell towers (*i.e.* antenna towers covering specific geographic areas) and sectors (*i.e.* faces of the towers) to which the Target Number will connect at the beginning and end of each communication.

5. Specialized location records, such as Timing Advance records and RTT data.

**July 7, 2025** to the date of this warrant:

1. Specialized location records such as Timing Advance records and RTT data.

2. Data sessions with Cell Site Location Information such as Timing Advance records, estimated location data, and data sessions with Cell Site Location records.

3. Call Detail Records with Cell Site Location Information, to include detail text message records without content and their Cell Site location records.

**II.    Information to be seized by the government**

All information described above in Section I that constitutes evidence of Johnson's location in order to facilitate her arrest and to locate property used in violations of Title 18, United States Code, Sections 1512(k), and 1512(b)(1) (Conspiracy to Tamper with Witnesses, Victims, and Informants) and is the subject of an arrest warrant issued on June 18, 2025, and is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4). As well as the identification of individuals who are engaged in, and the locations of places used for,

3

the commission of these offenses, involving Jessica Johnson and other individuals engaged in these crimes whose identities are currently known and unknown

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by T-Mobile in order to locate the things particularly described in this warrant.

4

## Certificate of Authenticity of Domestic Records Pursuant to Federal Rules of Evidence 902(11) and 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by T-Mobile and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of T-Mobile. The attached records consist of _____ associated with the device assigned phone number (813) 857-4703. I further state that:

a.    All records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of T-Mobile, and they were made by T-Mobile as a regular practice; and

b.    Such records were generated by T-Mobile's electronic process or system that produces an accurate result, to wit:

5

1.  The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of T-Mobile in a manner to ensure that they are true duplicates of the original records; and

2.  The process or system is regularly verified by T-Mobile, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____
Date                        Signature

6